IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| Beverly Bradford, | ) Civil Action No. 3:04-21864-MJP-JRM |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| Richland County School District One and | ) |
| Sanita Savage, individually and in her capacity | ) |
| as Senior Associate for Richland County School | ) **REPORT AND RECOMMENDATION** |
| District One, and John Doe actors, | ) |
| | ) |
| Defendants. | ) |
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ | ) |

Plaintiff, Beverly Bradford ("Bradford"), is a former employee of Richland County School District One ("Richland One"). She originally filed this action in the Court of Common Pleas for Richland County. It was removed to this court on August 12, 2004.[1] Bradford filed an amended complaint on February 15, 2005. She alleges disparate treatment in discipline based on her race (African-American) against Richland One in violation of Title VII (First Claim); a similar claim against Richland One, Sanita Savage ("Savage"), and "other John Doe Actors" in violation of 42 U.S.C. § 1981 (Second Claim); a Title VII retaliation claim against Richland One (Third Claim); and supplemental claims against Richland One for breach of contract and breach of contract accompanied by a fraudulent act (Fourth and Fifth Claims).

Defendants filed a motion for summary judgment on April 24, 2006. Plaintiff filed a response on January 23, 2007. Defendants filed a reply on February 5, 2007.

_____

[1]Pretrial matters were automatically referred to the undersigned pursuant to Local Rule 73.02(B)(2)(g), D.S.C.

## Standard for Summary Judgment

When no genuine issue of any material fact exists, summary judgment is appropriate. <u>Shealy v. Winston</u>, 929 F.2d 1009, 1011 (4th Cir. 1991). The facts and inferences to be drawn from the evidence must be viewed in the light most favorable to the non-moving party. <u>Id.</u> Courts take special care when considering summary judgment in employment discrimination cases because states of mind and motives are often crucial issues. <u>Ballinger v. North Carolina Agric. Extension Serv.</u>, 815 F.2d 1001, 1005 (4th Cir.), <u>cert. denied</u>, 484 U.S. 897 (1987). This does not mean that summary judgment is never appropriate in these cases. To the contrary, "'the mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material fact.</u>'" <u>Id.</u> (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242 (1986). "Genuineness means that the evidence must create fair doubt; wholly speculative assertions will not suffice." <u>Ross v. Communications Satellite Corp.</u>, 759 F.2d 355, 364 (4th Cir. 1985).

In this case, defendant "bears the initial burden of pointing to the absence of a genuine issue of material fact." <u>Temkin v. Frederick County Comm'rs</u>, 945 F.2d 716, 718 (4th Cir. 1991) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). If defendant carries this burden, "the burden then shifts to the non-moving party to come forward with facts sufficient to create a triable issue of fact." <u>Id.</u> at 718-19 (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986).

Moreover, "once the moving party has met his burden, the nonmoving party must come forward with some evidence beyond the mere allegations contained in the pleadings to show there is a genuine issue for trial." <u>Baber v. Hosp. Corp. of Am.</u>, 977 F.2d 872, 874-75 (4th Cir. 1992). The non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to

2

defeat a motion for summary judgment. Id. and Doyle v. Sentry Inc., 877 F. Supp. 1002, 1005 (E.D.Va. 1995). Rather, the non-moving party is required to submit evidence of specific facts by way of affidavits [see Fed. R. Civ. P. 56(e)], depositions, interrogatories, or admissions to demonstrate the existence of a genuine and material factual issue for trial. Baber, citing Celotex Corp., supra. Moreover, the non-movant's proof must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." Mitchell v. Data General Corporation, 12 F.3d 1310, 1316 (4th Cir. 1993) and DeLeon v. St. Joseph Hospital, Inc., 871 F.2d 1229, 1233 (4th Cir. 1989), n.7. Unsupported hearsay evidence is insufficient to overcome a motion for summary judgment. Martin v. John W. Stone Oil Distrib., Inc., 819 F.2d 547 (5th Cir. 1987) and Evans v. Technologies Applications & Services Co., 875 F. Supp. 1115 (D.Md. 1995).

### Facts

The record shows the following facts in the light most favorable to Bradford:

1.  Bradford is African-American (Pl. Aff., ¶ 2).[2]

2.  Bradford became employed as a teacher by Richland One in 1995-1996 academic year (Id.).

3.  Bradford became Assistant Principal at Eau Claire High School ("Eau Claire") for the 2001-2002 school year (Id.).

4.  On April 15, 2002, Bradford and Richland One entered into a written contract for her to continue as Assistant Principal at Eau Claire ("Admin/Inst. Supp. Staff") for the 2002-2003 school year (Pl. Aff., 3A).

5.  During relevant times:

    a.  Savage, an African-American, was Richland One's Senior Associate for Human

---

[2]Bradford's affidavit is Ex. 3 to her memorandum. Several documents are attached as exhibits to her affidavit ("Pl. Aff., 3A-J").

Resource Services (Savage Aff., ¶¶ 1 and 21);

b.    Ronald Epps ("Epps"), an African-American, was Richland One's Superintendent (Pl. Aff., 3E and Savage Aff., ¶ 21);

c.    Carlos Smith ("Smith"), an African-American, was Interim Principal at Eau Claire (Pl. Aff., 3B and Savage Aff., ¶ 21); and

d.    Teresa Craft ("Craft"), an African-American, was Guidance Department Chair at Eau Claire. (Savage Aff., ¶¶ 2 and 21).

6.    On April 4, 2003, Bradford and Craft got into an argument. Prior to this time they had been friends. The argument appears to have started because Bradford was critical of Craft's work, and Craft was angry because Bradford had not joined in Craft's birthday lunch celebration. According to Bradford, Craft struck her middle finger in her (Bradford's) face, and she (Bradford) removed it. (Bradford Aff. ¶¶ 3 and 4).[3]

7.    Craft reported the incident to Smith (Savage Aff., Ex. 6 and Pl. Aff., ¶ 6).

8.    Bradford, Craft, and two witnesses provided Smith with written statements concerning the incident dated April 7, 2003. (Pl. Aff., 3B and Savage Aff., Ex. 5-8).

9.    On April 10, 2003, Richland One offered Bradford a contract to be a teacher for the 2003-2004 school year. Bradford signed and returned the contract on April 25, 2003. (Pl. Aff., 3E).

10.    On April 11, 2003, Epps notified Bradford that she was placed on administrative leave with

---

[3]Craft's version of the events was significantly different. She stated the Bradford twisted her finger and arm causing pain and injury. In addition to the process that followed at the school, Craft took out a warrant against Bradford for assault and filed a law suit against Bradford and Richland One. (Savage Aff., ¶¶ 11 and 12).

pay pending an investigation. (Pl. Aff., 3E).

11.    Savage investigated the incident by reviewing all statements and interviewing Bradford, Craft, and the witnesses. (Savage Aff., ¶ 5).

12.    Savage concluded that Craft's version of the incident, which was corroborated by the two witnesses, was more credible. (Savage Aff., ¶ 10).

13.    On May 5, 2003, Savage issued Bradford an "official reprimand" based on the finding that Bradford "initiated physical contact with Ms. Craft" which "caused disruption to the school environment and is viewed as being unprofessional in nature." (Pl. Aff., 3A and Savage Aff., Ex. 9).

14.    Also on May 5, 2003, Savage notified Bradford of the end of her administrative leave and reassigned Bradford from her position as Assistant Principal to the Registrars Office for the remainder of the 2002-2003 school year. (Savage Aff., Ex. 8).

15.    On May 16, 2003, Bradford filed a grievance with Richland One alleging misapplication of policies and seeking "(t)o be assigned as assistant principal at the appropriate salary level w/o lost compensation and employment status.  Removal of derogatory information/letter of reprimand from my personnel record related to this Teresa Craft incident." (Savage Aff., Ex. 10).

16.    After a hearing on May 29, 2003, the grievance was denied. (Savage Aff., Ex. 11).

17.    Bradford's appeal was denied by Epps and the Richland One School Board. (Savage Aff., ¶ 20).

18.    Bradford began counseling for depression in July of 2003. (Bradford Aff., ¶ 12).

19.    On or about August 25, 2003, Bradford filed a Charge of Discrimination with the South Carolina Human Affairs Commission ("SCHAC") alleging that the reprimand, reassignment,

5

and demotion were due to her race. (Savage Aff., Ex. 1).

20.    Bradford was unable to begin her teaching contract as a Special Education teacher for the 2003-2004 school year at Crayton Elementary School ("Crayton") until October of 2003 "due to illness, anxiety and depression." (Bradford Aff., ¶ 13; Lacy Aff., ¶ 11).

21.    At relevant times:

    a.    Virginia Lacy ("Lacy"), a Caucasian, was principal of Crayton (Lacy Aff., ¶ 1);

    b.    Cheryl Taylor ("Taylor"), a Caucasian, was assistant principal at Crayton;

    c.    Gloria Kohn ("Kohn"), a Caucasian, was Bradford's instructional assistant (Lacy Aff., ¶ 13); and

    d.    Cynthia Watson ("Watson"),[4] a Caucasian, was a Special Education teacher (Lacy Aff., ¶ 22).

22.    Bradford and Watson conducted classes in the same room, and Kohn was their assistant.

23.    On December 5, 2003, Bradford filed a second SCHAC Charge of Discrimination alleging retaliation because Richland One delayed her October paycheck and Taylor had said negative things about her to staff and students. (Savage Aff., Ex. 2).

24.    Lacy received complaints about Bradford from staff and students and a meeting was held on January 21, 2004 with Lacy, Bradford, Watson, and Kohn present. (Lacy Aff., ¶ 13).

25.    On January 23, 2004, Bradford wrote an e-mail to her attorney (with copy to Lacy) alleging that the meting of January 21 had been retaliation because of her EEOC complaint.  Lacy responded to Bradford on February 4, 2004. (Lacy Aff., ¶ 14 and Ex. 3).

26.    On February 2 or 3, 2004, Bradford, Watson and Kohn had a flare up over disruptive

---

[4]Bradford refers to Watson as "Watts" during her depositions.

6

behavior in their shared classroom.  Bradford (Lacy Aff., Ex. 4), Watson (Lacy Aff., Ex. 5), and Kohn (Lacy Aff., Ex. 8) prepared written statements.

27.     On February 3, 2004, Kohn and Bradford had a confrontation in the cafeteria.  Bradford (Lacy Aff., Ex. 7), Kohn (Lacy Aff., Ex. 6), Bill Jones (Lacy Aff., Ex. 9) and S. Madden (Lacy Aff., Ex. 10) prepared written statements.

28.     Bradford requested that her class be separated from Watson's class and that Kohn be removed as her instructional assistant.  Lacy granted these requests. (Lacy Aff., ¶¶ 22 and 23).

29.     In March of 2004, Lacy reviewed the language arts papers of all Crayton students and followed up with a discussion with their teachers. (Lacy Aff., Ex. 13).

30.     On March 20, 2004, Lacy wrote Bradford a note, "I have suggestions about student writing. Please bring them (i.e., the papers) with you and meet with me." (Lacy Aff., Ex. 12).

31.     Bradford responded on March 23, 2004:

> You are still trying to harass me.  I have a right to work.  I am asking that you do so without prejudice.  I have asked me (sic) attorney to file additional retaliation charges against you and Ms. Taylor.  (Id.).

32.     Lacy responded on March 23, 2004 (Lacy Aff., Ex. 13).

33.     Bradford responded to Lacy on March 25, 2004. (Lacy Aff., Ex. 14).

34.     The EEOC issued its right to sue letter on March 31, 2004. (Savage Aff., Ex. 3).

35.     Lacy again wrote Bradford on April 12, 2004 stating:

> I hope the suggestions I shared with you and Carrie Watson on Saturday, April 3rd will be helpful.  In response to your correspondence of March 25th, as stated previously, you need to direct your legal concerns to your attorney. I am not involved with those issues.  My main concern is to make sure that I meet the instructional needs of the students.  There has been no attempt to bridge your constitutional rights.  There is an appropriate time and place for everything.  This is my last correspondence to you regarding this matter

7

concerning your legal issues with the district.  Any future correspondence from you regarding this matter will be forwarded to the district office for response.

(Lacy Aff., Ex. 15).

36.   Bradford responded in writing, "Is that a threat?" (Lacy Aff., Ex. 16).

37.   Later in April of 2004, Bradford was exposed to gasoline fumes after a piece of lawn equipment was improperly stored in a closet in the cafeteria.  She was treated by the school nurse, left Crayton in an ambulance, and never returned to work. (Pl. Dep. of January 20, 2006, pp. 22-24; Lacy Aff., ¶ 30).

38.   By letter of October 12, 2004, Bradford notified Savage of her resignation "(d)ue to the ongoing harassment I have experienced and the advice from my medical providers." (Pl. Aff., 3I).

## Discussion

A.   Disparate Treatment

In her first two claims, Bradford alleges that she was subject to disparate treatment in discipline by defendants because of her race.  In this regard, she asserts that her reprimand, transfer to the Registrar's office, and demotion to a teaching position at Crayton the following school year were adverse employment actions.  Title 42 U.S.C. § 2000e-2a states in part:

It shall be an unlawful employment practice for an employer--

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; . . . .

This is a disparate treatment case and plaintiff must prove that "but for" her race, she would not have been disciplined more harshly than her Caucasian comparator.  Holmes v. Bevilacqua, 794

8

F.2d 142 (4th Cir. 1986). Plaintiff can prove defendants' motive to discriminate by two methods. First, the "plaintiff may meet this burden under the ordinary standards of proof by direct and indirect evidence relevant to and sufficiently probative of the issue. In the alternative, a plaintiff may resort to the judicially created scheme established in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973) and <u>Texas Department of Community Affairs v. Burdine</u>, 450 U.S. 248 (1981)." <u>EEOC v. Clay Printing Company</u>, 955 F.2d 936 (4th Cir. 1992).

To overcome a motion for summary judgment, under the ordinary standards of proof, plaintiff is required to "produce direct evidence of a stated purpose to discriminate on the basis of race and/or circumstantial evidence of a stated purpose to discriminate on the basis of race of sufficient probative force to reflect a genuine issue of material fact." <u>Goldberg v. B. Green and Co., Inc.</u>, 836 F.2d 845 (4th Cir. 1988). In the absence of direct or indirect proof plaintiff can employ the <u>McDonnell Douglas</u> scheme to establish a prima facie case of discrimination.

Since plaintiff's claim is based on discipline for misconduct, she must show:

1. She is a member of a protected class;

2. She engaged in prohibited conduct comparable in seriousness to employees outside the protected class; and

3. She was subjected to disciplinary measures more severe than those imposed on the employee outside the protected class.

See <u>Moore v. City of Charlotte, NC</u>, 754 F.2d 1100 (4th Cir.), *cert. denied*, 472 U.S. 1021 (1985); <u>Cook v. CSX Transportation Corporation</u>, 988 F.2d 507 (4th Cir. 1993); and <u>Hughes v. Bedsole</u>, *cert. denied*, 516 U.S. 870 (1995).

If a plaintiff establishes a prima facie case, a rebuttable presumption is created that the discharge was due to unlawful discrimination. <u>St. Mary's Honor Center v. Hicks</u>, 509 U.S. 502, 504 (1993). The defendant must then come forward with a legitimate non-discriminatory explanation

for its action.  When the defendant does so, the presumption of discrimination evaporates, and plaintiff must prove that the defendants' proffered reason is pretextual and that the discharge was due to unlawful discrimination.  Id.

Therefore, Bradford must show that she was more severely disciplined than her Caucasian comparator for engaging in comparable conduct.  To make this showing, she must show that she and her comparator was "similarly situated."  In order for the Court to determine whether Bradford and her comparator was similarly situated, the Court "'must look at all relevant factors, the number of which depends on the context of the case.'" Disher v. Weaver, 308 F.Supp.2d 614, 621 (M.D.N.C. 2004), quoting Radue v. Kimberly-Clark Corp., 219 F.3d 612, 619 (7th Cir. 2000)."  "Summary judgment for the employer is proper under a discriminatory enforcement claim where the plaintiff has not proffered sufficient evidence that similarly situated white employees were treated more favorably."  Gaither v. Wake Forest Univ., 129 F.Supp.2d 863, 869 (M.D.N.C. 2000).  When analyzing plaintiff's claim, the Court must consider the entire record and not merely focus on a single part of the record.  Carter v. Ball, 33 F.3d 450 (4th Cir. 1994).  Although the Fourth Circuit has given little guidance on this issue, it has been noted that "a plaintiff must show that he or she was similarly situated to other employees from outside his protected class in all relevant aspects." Truesdale v. Potter, 2003 WL 1522945, *5 (M.D.N.C. 2003), citing Radue, 219 F.3d at 617; Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997).     This generally means that plaintiff and his comparators "dealt with the same supervisor, [were] subject to the same standards and...engaged in the same conduct without such mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."  Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992) (citing Maggella v. RCA Global Communications, Inc., 642 F. Supp. 1531 (S.D.N.Y. 1986), aff'd, 814 F.2d 653 (2d Cir. 1987).  "When different decision makers are involved, two decisions

are rarely 'similarly situated in all relevant respects.'" <u>Harvey v. Anheuser-Busch, Inc</u>., 38 F3d 968, 972 (8th Cir. 1994).

Additionally, a plaintiff must offer sufficient proof to show that the similarly situated person from outside his protected class were not similarly disciplined for like offenses. <u>Moore</u>, 754 F.2d at 1107-11. While the conduct does not have to be identical, the similarly situated employee must have engaged in conduct of "comparable seriousness." <u>Cook v. CSX Transp. Corp.</u>, 988 F.2d 507, 511 (4th Cir. 1993).

Defendants concede that Bradford is a member of a protected group and that she was subjected to adverse employment actions. In their brief, defendants cite a different prima facie case standard than the one set forth above and argue Bradford cannot show satisfactory job performance. Bradford cites the above prima facie case standard in her brief. Defendants appear to accept the standard in their reply brief. Plaintiff cites a lone Caucasian comparator in her arguments. It is without question that the comparator received a lesser punishment. The issue presented is whether the comparator and Bradford were similarly situated and engaged in conduct of comparable seriousness.

Bradford's comparator is Marilyn Davis ("Davis"), Richland One's Director of Special Education. She is Caucasian. On April 28, 2003, she inappropriately touched Lillian Crosby-Brown ("Crosby-Brown") who was a Medicaid billing employee for Richland One. The record contains portions of Crosby-Brown's deposition (Pl. Mem., Ex. 2) and the affidavit of Richard Moniuszko ("Moniuszko"), Deputy Superintendent of Richland One (Def. Mem., Ex. 5). Moniuszko "review(ed) the complaint filed by an African American Employee Lillian Crosby-Brown against a Caucasian supervisory administrator." (Moniuszko Aff., ¶ 2). Attached as exhibits to Moniuszko's affidavit are statements concerning the incidents from Crosby-Brown, Davis, and witnesses as well

11

as correspondence regarding the investigation.

The record shows that Davis placed her hands on Crosby-Brown's shoulders, turned her around, and directed her to her work station so that she could continue to work instead of chatting with other employees about non-work related matters. On May 5, 2003, Crosby-Brown wrote a memorandum to Davis complaining about inappropriate touching and asking that she be assigned another supervisor. Savage wrote Crosby-Brown and told her that Moniuszko would "review this matter, and if not resolved, he will direct it back to my attention." After the statements were gathered, Moniuszko met with Crosby-Brown and wrote her on June 26, 2003 confirming that Davis "placed her hands on your shoulders to redirect you," but failed to find this created a "hostile work environment." A meeting was scheduled between Crosby-Brown, Davis, and Moniuszko on July 16, 2003. At that meeting, Davis apologized for the inappropriate touching. Moniuszko declined to assign Crosby-Brown a different supervisor. Crosby-Brown appealed to Epps and a meeting was held on August 8, 2003 with Savage present. Epps granted Crosby-Brown's request that she be supervised by someone other than Davis.

Defendants argue that Bradford and Davis were not similarly situated because they had different supervisors. This is undoubtedly so. One would assume that as an Assistant Principal, Bradford would have been supervised by her principal. Davis was Richland One's Supervisor of Special Education. It is not clear who was her direct supervisor. Bradford's claim was primarily reviewed by Savage. In the light most favorable to Bradford, Savage delegated the investigation of Crosby-Brown's claim to Moniuszko (Moniuszko Aff., Ex. 2). Savage advised Crosby-Brown that if the claim was not resolved that the matter would be returned to her. It is not clear what role Savage played after Moniuszko reached his decision, but it appears Crosby-Brown appealed that decision directly to Epps. However, Savage was present at the final meeting on Crosby-Brown's

12

complaint.  Epps was the ultimate decision maker regarding both complaints.

This is not a situation where a worker on one shift at an industrial plant is disciplined by his supervisor and attempts to differentiate the punishment he received from that of a comparator on a different shift supervised by a different supervisor.  Richland One appears to have a disciplinary apparatus which runs through its Human Resource Director, Savage, to its Superintendent, Epps.  In the light most favorable to plaintiff, the decision makers for Bradford and Davis must be considered as one.

Defendants next argue that actions of Bradford and Davis, even though both involved an inappropriate touching, were qualitatively entirely different.  The undersigned agrees.  There is nothing in the record to show that Davis used more than minimal force to direct Crosby-Brown to her work area.  Crosby-Brown's complaint about the incident was not made until a week later.  The complaint indicated that Crosby-Brown thought Davis' actions were "inappropriate" and "unprofessional."  She indicated that she did not want Davis to "put her hands on me again" and requested a different supervisor.  The matter was resolved by an apology and Epps granting Crosby-Brown's request for a new supervisor.  On the other hand, Bradford assaulted Craft by twisting her arm behind her back inflicting injury and pain.  Craft's reaction and complaint were immediate.  The incident occurred on Friday and Craft called Smith at home to report it on Saturday.  Craft also filed a police report and an arrest warrant.[5]  The amount of force used by Bradford was significantly greater than that used by Davis and the circumstances were different.  The reactions of the victims (Craft and Crosby-Brown) were completely different.  This is indicative because each victim had a different perspective of the nature of the inappropriate touching, the context, and the amount of

---

[5]Bradford was found not guilty by a bench trial. (Pl. Dep. 76-77).

force used.  Therefore, the differences in investigation and discipline in the two incidents are completely reasonable.

One other mitigating factor distinguishes the conduct of Bradford and Davis and defendants' treatment of it.  The Bradford/Craft incident occurred at Eau Claire.  The Davis/Crosby-Brown incident occurred in an administration building.  "(T)he Bradford/Craft [incident] occurred between school administrators who are role models for their students.  It occurred during the school day on school grounds.  It compromised the ability of Bradford to serve as a positive role model for students and to serve in a leadership position at the school level." (Moniuszko Aff., ¶ 23).

The undersigned concludes that the conduct of Bradford and Davis were not of comparable seriousness and, therefore, Bradford has not established a prima facie case of disparate discipline based on race.

     B.     Retaliation

To establish a prima facie case of retaliation, it must be demonstrated that:

     (1)     the employee engaged in protected activity;

     (2)     the employer took some adverse employment action against the employee; and

     (3)     a causal connection existed between the protected activity and the adverse action.

See Anderson v. G.D.C., Inc., 281 F.3d 452, 458 (4th Cir. 2002); Causey v. Balog, 162 F.3d 795, 803 (4th Cir. 1998); Carter v. Ball, 33 F.3d 450, 460 (4th Cir. 1994).   If the plaintiff establishes a prima facie case, the burden shifts to the defendant to produce evidence of a legitimate, non-retaliatory reason for the adverse action.  Texas Dep't of Community Affairs v. Burdine, 450 U.S. at 254. If the defendant meets this burden, the plaintiff must show by a preponderance of the evidence that the proffered reason was pretextual, and that the adverse action was imposed because

the plaintiff engaged in protected activity. <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133 (2000).

    1.    Adverse Action

    The Fourth Circuit, in <u>Von Gunten v. Maryland</u>, 243 F.3d 858 (4th Cir. 2001), addressed what an "adverse employment action" is for purposes of a Title VII retaliation claim. Although "ultimate employment actions" are adverse employment actions, a Title VII retaliation claim does not require an ultimate employment action. In <u>Burlington Northern & Santa Fe R.R. Co. v. White</u>, ___ U.S. ___, 126 S.Ct. 2405, 2410 (2006), the Supreme Court held that a plaintiff is not required to show "an adverse effect on the 'terms, conditions, or benefits' of employment" to support a retaliation claim (quoting <u>Von Gunten</u>, 243 F.3d at 866). It is sufficient if the plaintiff shows that a reasonable employee finds the employment action "materially adverse" or likely to "dissuade a reasonable worker from making or supporting a charge of discrimination." <u>Id</u>. at 2415 (quoting <u>Rochon v. Gonzales</u>, 438 F.3d 1211, 1219 (D.C. Cir. 2006)).

Bradford filed her second charge of discrimination alleging retaliation on or about December 5, 2003. In that charge, Bradford asserted that Richland One had retaliated against her by delaying her October paycheck and that Taylor, the Assistant Principal had made negative comments about her to staff and students. (Savage Aff., Ex. 2). As discussed above, Lacy counseled Bradford in January of 2004; February brought disagreements between Bradford, Watson and Kohn;[6] Lacy attempted to discuss language arts with Bradford in March of 2004; and in April of 2004, Bradford was exposed to gasoline fumes.

---

[6]The most serious complaint Bradford had against other teachers was resolved in her favor when her classroom was separated from that of Watson and Kohn was no longer her instructional assistant.

The majority of the incidents do not constitute retaliation because they were not materially adverse to Bradford.  "Retaliatory actions "do not typically, if ever, include general immunity from the application of basic employment policies of exemption from [an employer's] disciplinary procedures."  <u>Von Gunten</u>, 243 F.3d at 869.  Likewise, the terms, conditions and benefits of employment do not include an immunity from supervision and counseling of the employee.  Further, "petty slights, annoyances, and simple lack of good manners" do not constitute adverse actions in the employment context.  <u>Burlington Northern and Santa Fe Ry.</u>, 126 S.Ct. at 2415.

Thus, only two incidents cited by Bradford might be considered as adverse actions: (1) the delay of payment of salary in October of 2003; and (2) Bradford's inhalation of gas fumes in April of 2004.  Defendants concede these two events occurred.

2.     Causal Connection

Defendants appear to argue that Bradford cannot show a causal connection between her protected activity and the adverse action because the people she accuses were not aware of her EEOC claim.  This argument is without merit.  The memorandum from Lacy to Bradford dated February 4, 2004 stated that Lacy, the Principal at Crayton, was aware of the EEOC complaint "through information you have shared with other faculty members and your letting me know that you needed time to meet with your attorney during the day." (Lacy Aff., Ex. 3).  Lacy's affidavit states that she became aware of Bradford's claim at an unspecified time after Bradford reported to work in October of 2003 and that Bradford informed her of the claim by January 22, 2004. (Lacy Aff., ¶¶ 3-5).

Thus, the undersigned concludes that Bradford has established a prima facie case of retaliation with respect to the two adverse actions mentioned above.

3.     Pretext

16

Defendants have proffered legitimate, non-retaliatory reasons with respect to these adverse actions.

In her second charge of discrimination alleging retaliation, Bradford asserts "the school district failed to pay me my October paycheck on time. My check was supposed to be direct deposited and it was not." (Savage Aff., Ex. 2). When questioned about the specifics of this allegation, Bradford had no recollection of any factual basis for her assertion. (Pl. Dep. of Jan. 20, 2006, 10-13). An affidavit of Elaine Jackson submitted by defendants, shows that in October of 2003, Bradford was "docked for three days she actually worked." (Jackson Aff., ¶ 7). A "manual check" was issued to correct the error. (Id.). This miscalculation appears to be the only basis of Bradford's claim.[7] Bradford does not discuss this issue in her memorandum in opposition to summary judgment.

During her depositions, Bradford testified that it was her belief that defendants intentionally subjected her to gasoline fumes in retaliation for her having engaged in a protected activity. (Pl. Dep. 116; Pl. Dep. of Jan. 20, 2006, 22-24). However, she offers no proof for this assertion. Bradford reported the incident to OSHA and an investigation was completed. The OSHA report is not a part of this record. According to Lacy, the incident accidently occurred because "an employee of a private contractor inappropriate stored a leaf blower in an interior closet inside the cafeteria." Bradford does not discuss this incident in her memorandum in opposition to summary judgment.

Bradford has not shown that defendants' proffered reasons were a pretext for retaliation.

C.     Contract Claims

---

[7]Jackson also avers the results of a regular audit which showed that Bradford was being slightly overpaid because she was being credited with 19 years of service rather than the 18 years to which she was entitled. Her paycheck was adjusted.

17

Bradford alleges that "Richland One made specific promises to her regarding her employment, including procedural safeguards she would be provided as an employee of Defendant Richland One and the promises were memorialized in writing [and]...constitute an enforceable employment contract under South Carolina common law." (Amended Complaint, ¶¶ 46 and 47). Bradford further alleges Richland One "concocted fraudulent reasoning for breaching its contractor obligations." (Amended Complaint, ¶ 53). Defendants argue in their memorandum in support of summary judgment that Bradford has failed to identify any provision of her written contracts or any policy which created a further contractual obligation on the part of Richland One. Bradford specifies two policies which she claims constituted a contract with Richland One breached in her opposition memorandum. (Pl. Mem., p. 9).

Richland One's "Discipline, Suspension and Dismissal of Professional Staff" policy states:

> Evident unfitness for duty is manifested by conduct such as, but not limited to, the following:
>
> - persistent neglect of duty
> - willful violation of rules and regulations of the board
> - drunkenness
> - conviction of a violation of the laws of this state or the United States
> - gross immorality
> - dishonesty
> - illegal use, sale or possession of drugs or narcotics
>
> Whenever a principal or other school administrator charged with supervision of a teacher or employee finds it necessary to reprimand a teacher or employee for a reason that he/she believes may lead to dismissal or cause, he/she shall take the following steps.
>
> - Bring the matter in writing to the attention of the teacher or employee involved and make a reasonable effort to assist the teacher or employee to correct whatever appears to be the cause of potential dismissal or failure to be re-employed.
>
> Except in those cases warranting immediate suspension, allow reasonable

time for improvement.

The superintendent reserves the right to mandatorily refer employees for physical and/or mental evaluation.  The district shall assume costs for the initial evaluation and/or consultation.  Upon receiving the official report, the superintendent reserves the right to mandate further evaluation or to permit the teacher or employee to return to work.

Any again against under this policy shall be taken pursuant to the provision of Teacher Employment and Dismissal Act, Sections 59-25-410, et. seq., Code of Laws of South Carolina, 1976, as amended.

(Pl. Mem., Ex. 7).

Richland One's "Assignment and Transfer of Instructional Staff" provides with respect to

"Involuntary Transfers":

If in the opinion of the superintendent, an involuntary transfer would be in the best interest of the district, the district will use the following procedures:

The superintendent or his/her designee shall discuss the need for the transfer with the current principal or with the current immediate supervisor.

The superintendent or his/her designee shall have a conference with the principal of the school or department to which a transfer is being contemplated.

The superintendent or his/her designee shall then talk with the person to be transferred, giving reasons why the transfer is being made. Refusal to transfer may result in loss of employment.

The administration shall not use the transfers as a disciplinary action.

Any improvement plans in force at the time of the transfer shall remain in force at the new assignment.

Attempts shall be made to ensure that all involuntary transfers are completed prior to April 15.

(Pl. Mem., Ex. 8).

Bradford alleges that Richland One's Discipline Policy (Pl. Mem., Ex. 7) creates an

19

obligation on the part of Richland One to "allow [her] reasonable time for improvement." (See Pl. Mem., p. 9). Bradford alleged misapplication of this policy in her grievance (Savage Aff., Ex. 10). At Step 1 of the grievance process, Savage determined that "Policy GCQF [i.e., the Discipline Policy] is not applicable. Grievant was not suspended or dismissed. Grievant was placed on administrative leave with pay while the incident was being investigated." (Savage Aff., Ex. 11). This interpretation was ratified on appeal. (Savage Aff., ¶ 20). Bradford did not file a grievance with respect to her "involuntary transfer."

The record contains several written contracts entered into by Richland One and Bradford. Bradford argues that Richland One's policies may create further contract provisions. (Pl. Mem., p. 9). Defendants do not disagree with this concept but argue that Bradford has not shown that Richland One breached any mandatory policy. (Def. Reply Mem., pp. 6-8). The undersigned agrees.

A close reading of the Discipline Policy shows that improvement provision upon which Bradford relies is not applicable to her situation. The policy applies where the administrators "finds it necessary to reprimand a teacher or employee for a reason that he/she **believes may lead to dismissal....**" (Emphasis added). There is nothing in the record to indicate that Savage considered dismissal of Bradford based on the Craft incident. Instead, Savage placed Bradford on leave with pay and assigned her to the Registrar's Office at the end of the investigation. (Savage Aff., ¶¶ 13 and 15).

The Transfer Policy is likewise inapplicable. The policy applies to "instructional staff," i.e., teachers. The record shows that while the investigation of the Craft incident was pending, Richland One offered Bradford a contract as a teacher, i.e., a new position, which Bradford accepted. Savage advised Bradford of her "assignment to Crayton Middle School as a Learning Disabilities Resource teacher" in a telephone conversation on August 22, 2003. (Savage Aff., Ex. 1). Since this was a new

20

position under a new contract, there was no transfer, involuntary or otherwise, implicating Richland One's Transfer Policy.

### Conclusion

Based on a review of the record and considering the arguments of the parties, it is recommended that defendants' motion for summary judgment be granted.

Respectfully submitted,

s/Joseph R. McCrorey
United States Magistrate Judge

March 6, 2007
Columbia, South Carolina